THE PEOPLE, RESPONDENT, *v.* LUGO ET AL., APPELLANTS.

APPEAL from the District Court of Mayagüez.

No. 452.—Decided May 1, 1913.

CONSPIRACY.—Upon examination, the evidence introduced in this case is found to be insufficient to establish the existence of a conspiracy and the judgment of conviction appealed from should be reversed.

The facts are stated in the opinion.

*Mr. Charles E. Foote, fiscal,* for The People.

*Messrs. López Landrón, Rincón* and *Francis* for appellants.

MR. JUSTICE MacLEARY delivered the opinion of the court.

This prosecution was begun in the Municipal Court of Cabo Rojo based on a sworn complaint made by Leonardo Recio, district chief of the Insular police, charging the defendants, who are here the appellants, with the crime of conspiracy alleged to have been entered into on September 6 and 7, 1911, in the town of Cabo Rojo, by wilfully and maliciously combining, plotting and agreeing to destroy insured property with the object of securing the insurance which had been placed thereon. The defendants were tried and convicted in the Municipal Court of Cabo Rojo and appealed from the judgment there rendered. The District Court of Mayagüez, before which this case was then taken on appeal, tried the same anew on March 19, 1912, and after hearing and considering the charge, the plea of not guilty, the evidence submitted and the statements of the parties, found the accused, Abraham Lugo and José Martí, guilty of the crime of conspiracy, sentencing each to imprisonment for one year in the district jail and to pay a fine of $1,000 each with one-half of the costs of the prosecution. From this judgment of conviction the accused on the same day, March 19, 1912, took an appeal through their attorney, Alfredo Arnaldo, Esq., to this Supreme Court.

In the record will be found a bill of exceptions and a statement of the case. The appellants, as well as The People, filed briefs and made oral arguments on the hearing.

For convenience we will take up the questions presented for our consideration in a different order from that in which they are set out in the briefs of the parties. This appeal is based on the following grounds, to wit:

"*First.* That the facts proven do not show that the accused formed any conspiracy or committed any act showing either of them to be guilty of the charge made against them.

"*Second.* That the court erred in overruling the peremptory exceptions to the complaint.

"*Third.* That the court was in error in denying the appellants'

motion to eliminate the interlineations or corrections in the original charge as amended and in permitting the accuser, Leonardo Recio, to swear out a new complaint before the clerk of the district court.

"*Fourth.* That the court erred in admitting secondary evidence regarding the policy of insurance on the merchandise which had been issued in favor of Abraham Lugo Quiñones."

In the briefs as well as the oral argument presented in this case the *fiscal* confesses error on the part of the trial court in the admission of a copy of the insurance policy without first laying the proper predicate, as is set forth in the fourth ground enumerated above, and asks that the case may be remanded to the court below for a new trial. On the other hand the counsel for the appellants contends that, for the various reasons assigned, the judgment should be reversed and the prosecution dismissed, acquitting the accused entirely.

Taking these questions up *seriatim* as indicated:

*First.* In regard to the sufficiency of the facts proven to show a conspiracy to have been formed or other inculpatory acts on the part of the accused. Let us examine all the evidence in detail. The essential testimony of the witnesses may be summarized as follows:

### EVIDENCE FOR THE PROSECUTION.

"Benigno Rodríguez testified that A. Lugo, S. en C., had insured their building in the Compañía L'Union de Paris to the amount of $4,000, effective up to September 6 and 7, 1911, and that the policy was endorsed in favor of Abraham Lugo Quiñones on August 12, 1911.

"Federico Schroeder testified that he was the Municipal Judge of Cabo Rojo on September 6, 7 and 8, when a fire took place which destroyed the municipal court and various other buildings.

"About 7. p. m. on the 6th he left for Mayagüez accompanied by Abraham Lugo, returning to Cabo Rojo about midnight; that on the return trip with Lugo he noticed the fire and got into a passing automobile, Lugo remaining in the coach. That about 4 o'clock on that same afternoon he saw a chaise (*calesa*) drawn up in front of Lugo's store, and on learning that it was going to Mayagüez he asked

the driver if he could take him as well; that while he was eating
Lugo came up and said that he would take him in the coach to
Mayagüez; that when he went to Lugo's house with such object
he failed to find him, but that about 7 p. m. he met him and stated
that on account of the unseasonable hour he had given up the idea
of making the trip; that thereupon Lugo insisted, saying that they
would arrive and return at an early hour; that in answer to wit-
ness's query as to why he had not started earlier he replied that
he had ordered a feed to be given his horse; that they went to Maya-
güez where they separated, Lugo telling him that he would do every-
thing possible to conclude his business promptly; that they met again
at midnight, Lugo explaining his tardiness by saying that he had
been playing billiards. Lugo drove while going to Mayagüez and
did his best to get there as soon as possible; that on arrival he in-
vited witness to accompany him to go to Añasco to become acquainted
with that town, an invitation which was declined; that on the re-
turn trip from Mayagüez Lugo apparently slept in the coach although
witness is of the impression that he was awake notwithstanding
that he saw him with his eyes closed. While on the road witness
saw the fire and took the reins from the hands of the boy in order
to hurry up the horse, *when he said* (seemingly referring to the boy)
that he did not wish him to drive, but as witness was more anxious
than he to arrive, seeing that it had been rumoured in Cabo Rojo
that there would be a conflagration at any moment, he got into a
passing automobile in order to arrive at his destination quicker.
It was rumoured that the fire would take place in the square or
block, where it actually occurred, as all the houses there were in-
sured and he had warned the head of the police department to keep
a watch on that part of the town.

"Rafael Montalvo testified that one or two days before the fire,
accompanied by Martí, he journeyed in a chaise (*calesa*) to Maya-
güez, and on returning from that city one Manuel Toro brought
back in the said *calesa* a box, the contents of which he is ignorant of,
but between the slats he perceived covers in which bottles are usually
placed. On arriving at Cabo Rojo Martí told him to hand the box
over to Lugo, to whose store he took it.

"Juan Paulino, 15 years old, testified that on September 6, on the
night of which date the fire took place in Cabo Rojo, he, under in-
structions from Lugo, took down to the store a box containing some-
thing over a tin or can of petroleum placed lengthwise; that the
slats or battens were not closely joined or flush and consequently the

coverings in which bottles of rum are placed were perceivable; that underneath the said covers or coverings, and in the corner of the box, he saw something red which he is sure must have been a tin or can, as when he placed the case on the truck (*rueda*) to take it to him again it sounded as such and when he carried it he could feel the liquid moving inside, and by looking through the corner he could see that the tin was red; that under orders given by Lugo he put the box in the rear of the store; that he does not know if tins of gasoline now come of the same color but that formerly gasoline tins were red and those of petroleum white, and the box or case to which he refers was of the same size as a tin of gasoline or petroleum.

"Alfredo Rodríguez, 15 years of age, testified that he was an employe of Lugo's and that on September 6, between 5 and 6 p. m., the coachman, Rafael Montalvo, brought a red can or tin in a box, which was placed in the rear part of the store; that Lugo's store was lighted with petroleum, for which purpose a very small supply was kept; that the store was lighted up only on Saturdays; that when he got to the store there was very little petroleum in the big can and during the time that he was there the can had not been used up, there remaining sufficient for the lighting of the store on the following Saturday, besides which the lamps themselves were provided with petroleum; that he was not informed as to what the box contained; that on work days sales of from $1 to $2 and on Sundays of $10 were made in Lugo's store; that the store was not well provisioned, all the articles being displayed at the front and the showcases were only used to a small extent; that in the places where cloth or stuff was lacking a piece of cloth was extended to cover and hide the vacant space; that the places not so covered contained a considerable quantity of cloth. That during the time that witness was there (he began work on June 15) the store received no new consignments as he had seen none arrive; that they sold but did not receive any merchandise. In the rear of the store was a bath about two *varas* long turned upside down on the ground, and also a table, but that the bath was not placed on top of the latter. That nothing of an inflammable nature, such as liquors, petroleum, or gasoline was sold in the store, nor was there denatured alcohol there; that there were approximately 30 boxes for men's shoes, but that some of them did not contain a single shoe; that there were from 20 to 30 with shoes; that there were about two dozen shoes for children. Men's shoes were retailed at $2, sometimes at $2.50; that

there were about 200 pieces of cloth although such pieces were not complete.

"Enrique López Delgado testified that on the day of the fire he was in Henry's carpentry the yard attached to which is the same as that of Lugo's store; that on the day in question they emptied a cask containing water that was in the yard at Lugo's request, he having presented himself at the door of the said carpentry and asked for somebody to help him do this, and that José Martí volunteered and between the two of them they emptied the cask.

"Luis Henry testified that on the day of the fire Lugo came to the carpenter shop to empty a cask of water; that he was unable to do so, whereupon he said: 'Who will help me?' and among a number that had gathered in the said shop José Martí proffered his services. Martí was not working in the cabinet-maker's shop, but was there incidentally repairing a shoeblack's kit; that he does not know what Martí was engaged in about that time as he had no trade. He adds: 'I understand that the water in the barrel was in bad condition as it stunk' and he took note that it emitted a bad smell; that it was a new barrel that had been taken there by Lugo, and the witness had given him a wood-shaving to burn as the barrel had contained lard which he set on fire, and that day he came to empty the water; that it (the barrel) had been filled with water for some days; that after it had been emptied it was allowed to remain in the same place where the water had run out.

"Juana Ayala testified that at the time of the fire she lived with Julia Yrizarry, who dwelt in concubinage with Martí. About a week before the fire she accompanied Julia to Lugo's house to get an order that Martí had given her for $10. This was the sole occasion on which she accompanied her and Julia took the amount in merchandise and not in cash.

"Julia Yrizarry testified that she was Martí's concubine; that previous to the fire she took an order that Martí had given her, which order was for $10; that prior to this she had not taken any order to Lugo's place. On other occasions she had taken orders from Martí to other establishments, two of which she mentions; that she is of the impression that Martí had a *finca* of some sort, although she has never gone there; that to her knowledge he has no trade or profession; that she took the order to Lugo about 15 days before the fire.

"Miguel del Toro Colberg testified that his notarial office and protocol was destroyed by the fire, the same having been situated next

to Lugo's store.  On January 14, 1911, he went with José Martí
to Lajas so that the wife of the latter might sign a general power
of attorney, and about a month afterwards Martí executed a deed of
sale.  Martí is married and witness is unable to say whether or not
he has a concubine.  After the granting of the power of attorney and
the sale of the rural property Martí asked him whether in case of
the loss of the original deed kept in a notary's office the sale could
be annulled, to which witness answered that the deed could, be
drawn up again.  That while in Lugo's house some days before the
fire the latter said that he was going to move to the house of Gre-
gorio Ramírez as it was better located; that on one occasion Lugo
said to Ramírez that he would have to stipulate as a condition for
moving that he, Ramírez, cancel the insurance policy.  He called at
Lugo's store at times but was never able to observe that he had either
cash or stock; that he saw six or eight empty shelves with cloth
on the outside to conceal their emptiness.

"Gregorio Ramírez testified that during August and September
he was negotiating the rental of a house to Lugo; that before making
the change it became necessary to cancel the insurance on the mer-
chandise; that he delivered the key of the house towards the end of
August, but Lugo did not move although he went so far as to start
on the show windows.  He delivered the key about the end of August
or beginning of September and the fire took place on September 6;
that he returned it to him about the end of October.

"José Quiles testified that he is a dealer in fancy goods and the
last purchase he made of Lugo was five or six days before the fire.
Lugo asked him whether he did not wish to buy some goods, to
which he replied that that depended on the price.  He stated what
goods he had purchased, and stated that the price was one cent less
than that which he had on previous occasions paid for the cloth
goods although as regards the other articles he had bought them for
a cent less.  His purchase amounted to $40 in percales and muslins.

"Arturo Grubman testified that he is an Insular policeman.  That
about 1.05 a. m. he passed the store of Lugo, keeping a good look-
out in accordance with orders he had received from his chief who
had instructed him to watch carefully the house in question as it
belonged to the court.  Everything was dark and he went to the
police station to get his raincoat, returning immediately.  He heard
a loud noise and, pulling the entrance door, found it open; that
under the stairway of the courthouse there was a table on which
was a large bowl from which proceeded flames and a smell of gaso-

line; under the said bowl there was no vestige of fire at that time; that the door leading to the yard (*patio*) was open.

"Leonardo Recio testified that he is the district chief of police. The municipal judge, José Martí, Lugo and the witness were together on the plaza; that Lugo and the judge went to Mayagüez, and he and Martí from that hour (7 p. m.) on until 1 a. m., when they parted, strolled around the town, after which the chief proceeded to the police station, where he heard the alarm of fire. Martí had never been in the habit of accompanying him at nights in that manner. That from the municipal court to the place where they parted is comprised a distance of 30 or 40 meters; that on arriving at the scene of the fire he observed a bath on a table, the contents of the former burning with greater fury than the fire in the basement of the house.

"José Flores testified that he is a policeman. On the day after the fire he took possession of a can and pail which had been located at the side of the stairway.

"A copy of the insurance policy was introduced in evidence.

EVIDENCE OF THE DEFENSE.

"José Yrizarry testified that he has a *cafetín* or confectioner's shop in Mayagüez. In September he sent a box containing his wares to Cabo Rojo. According to his recollection it was on the 6th and was addressed to Juan Rosario. The goods so sent were worth $11. The vehicle that conveyed the box to Cabo Rojo belonged to José Martí, who went along at the same time in the said coach. The effects consisted of tins of salmon, shrimps and some bottles of vermouth.

"Manuel Toro testified that he was in Yrizarry's store on the 6th. He does not remember the month, but he thinks it was in September. He then carried a box containing groceries to a coach destined to Cabo Rojo; that when he arrived at the confectionery or grocery the last slat on the box was being put on and he is unaware of the contents; that he delivered the box to the driver of José Martí's coach.

"Miguel Seda testified that he is acquainted with Lugo and was in his store some time during August, 1911; that he estimates the approximate worth of his stock as from $3,500 to $4,000. He states that while it is true he did not strike a balance he had had 24 years of experience and made an ocular observation; that he struck a balance every year in his own establishment, and that such balance was

not struck by ocular observation or inspection; that he does not know whether the boxes destined for shoes were full or empty.

"John Cancio testified that he was a silent or dormant partner of the firm of Lugo up to August, when he sold out. The firm's capital was $2,000, besides which it purchased merchandise in the market. He is of the impression that Lugo struck a balance when he, witness, retired as he showed him a document setting forth the stock on hand, in which it appeared that the firm's assets amounted to four thousand and odd dollars; that he does not know how much the firm owed, but that witness sold him his interest for $1,000, the exact amount he had paid in cash when purchasing, part of which $1,000 he had received in cash, part had been guaranteed and $200 were still owing. That he had withdrawn because it did not seem to him that the business was progressing satisfactorily, he having derived no benefit therefrom during its existence.

"Andrés Rodríguez testified that on the night of the fire he saw Martí and the (district) chief of police leave the club (casino). They then parted and witness went to a coffee shop to take coffee; that at that moment Martí arrived and they were together for some time; that he afterwards went to his home and, about five minutes before retiring for the night, heard the alarm of fire; that José Martí had remained in the coffee shop. It had been about five minutes since they parted."

The foregoing was all the evidence in the case. A careful reading of the same fails to disclose any facts sufficient to show the formation of any conspiracy or the commission of any other offence. It may be that suspicious circumstances are disclosed, but to sustain a conviction in this, as in every other criminal charge, the proof must establish the guilt of the defendants beyond a reasonable doubt. This the evidence in this case fails to do, hence the judgment of conviction cannot be sustained.

As for the second, third and fourth grounds enumerated, for which the appellants claim a reversal of the judgment rendered in the trial court, we may say that having found that there are not sufficient facts whereon to base a conviction it matters not whether the court erred in overruling exceptions to the complaint and in refusing to make elimi-

nations therefrom and in permitting a new complaint to be sworn to by the accuser or in admitting improper evidence. All these matters, in the view we have taken of the case, become immaterial in considering the appeal and we need not discuss them.

Other alleged errors supposed to have been committed by the trial court are mentioned in the brief and oral argument of the counsel for appellants, but they are too numerous even to be mentioned within the limits of this opinion, so they will be pretermitted.

We therefore hold that the error committed by the trial court in rendering a judgment of conviction on insufficient evidence requires the reversal thereof. So on that account the judgment of the court below should be reversed, and the lower court notified for proper action in the premises.

*Reversed.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.

Mr. Justice Wolf stated that he concurred in the judgment.